******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE AVIANZAH R. ET AL.[*]
# (AC 49396)

Suarez, Seeley and Palmer, Js.

*Syllabus*

The respondent mother appealed from the trial court's judgments terminating her parental rights as to two of her minor children, who previously had been adjudicated neglected and committed to the care and custody of the petitioner, the Commissioner of Children and Families. The mother claimed that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation, as required by statute (§ 17a-112 (j) (3) (B) (i)), as would encourage the belief that she could assume a responsible position in the children's lives within a reasonable period of time. *Held*:

The record contained sufficient evidence to support the trial court's determination that the petitioner had proven by clear and convincing evidence that the respondent mother failed to rehabilitate, as the court's findings regarding her lack of consistent engagement in individual counseling, her inability to meet her children's specialized needs and her failure to engage with their therapists, which would have provided her with insight into the children's behavior and mental health, were amply supported by evidence in the record, and, even if the court's findings concerning her housing and employment status were clearly erroneous, those findings were harmless in light of the cumulative evidence in the record that supported the court's determination that she had failed to rehabilitate.

This court rejected the respondent mother's claim that she should have been reunited with her children once it was determined that she had not been responsible for the death of another of her minor children, as the trial court was bound by its prior findings in the neglect proceeding, and, as the mother did not file an appeal challenging the adjudication of neglect, she could not collaterally attack it in the termination of parental rights proceeding.

The respondent mother's participation in required therapeutic and other services did not demonstrate, as she claimed, that she had rehabilitated, as substantial or even complete compliance with the court-ordered specific steps aimed at reuniting her with her children did not necessitate a conclusion that she had rehabilitated.

Argued May 21—officially released July 15, 2026[**]

[*]In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

[**]July 15, 2026, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Waterbury, Juvenile Matters, and tried to the court, *Torres*, *J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed*.

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Matthew J. Parenti*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

SUAREZ, J. The respondent mother, Jessica R., appeals from the judgments of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to her minor children, Avianzah R. (Avianzah) and Amyaliese R. (Amyaliese).[1] On appeal, the respondent claims that the court incorrectly determined that she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i).[2] We affirm the judgments of the trial court.

The following facts, which were found by the trial court by clear and convincing evidence or are otherwise undisputed in the record, and procedural history are relevant to this appeal. The respondent is married to Antonio R., and they have three children together: Amyaliese, who

[1] The court also terminated the parental rights of Antonio R., the respondent father of the children. He has not appealed from the termination of his parental rights. Accordingly, all references in this opinion to the respondent are to Jessica R. only.

[2] The attorney for the minor children filed a statement adopting the brief of the petitioner in this appeal pursuant to Practice Book §§ 67-13 and 79a-6 (c).

was born in 2015; Avianzah, who was born in 2019; and Amateo, who was born in 2021.[3]

The Department of Children and Families (department) became involved with Amyaliese and Avianzah in October 2022, after Amateo had been taken to Yale-New Haven Hospital with severe injuries that were determined to have been caused by inflicted trauma. On October 7, 2022, the petitioner filed ex parte motions for orders of temporary custody as to Amyaliese and Avianzah, and neglect petitions alleging neglect and physical abuse because, at that time, it could not be determined who had caused Amateo's injuries. The court granted the motions for orders of temporary custody. Amateo died as a result of his injuries three days later, on October 10, 2022.[4]

On December 8, 2022, the respondent pleaded nolo contendere with regard to the neglect petitions, but only as to the neglect allegations that Amyaliese and Avianzah were "being denied proper care and attention, physically, educationally, emotionally or morally . . . ." After a thorough canvass, the court, *Torres, J.*, accepted the pleas, adjudicated Amyaliese and Avianzah neglected and committed them to the care and custody of the petitioner. The court also canvassed the respondent as to the court-ordered specific steps she was required to undertake in order to regain custody of her children and ordered that they be made final.[5]

On June 4, 2024, the court approved a permanency plan of termination of parental rights and adoption with

---

[3]The respondent has three other children from previous relationships who do not reside with her and are not subjects of this appeal.

[4]Prior to being taken to the hospital, Amateo had been found unresponsive while in the care of a babysitter, who subsequently was arrested in connection with Amateo's death. It is not disputed that the respondent and Antonio R. have not been charged in connection with Amateo's death.

[5]The Judicial Branch form detailing the specific steps that the court ordered directed the respondent to take part in counseling and to make progress toward the identified treatment goals on the form. Below that directive, three boxes, labeled parenting, individual, and family were checked. In that same section, the specific steps form also contained a box titled "Goals (specify)," which was not checked; however, immediately next to that box, the specific steps form indicated, "see attached goals."

a concurrent plan of reunification as to both children. On August 26, 2024, the petitioner filed petitions for the termination of the respondent's parental rights as to both children. As to each child, the petitioner alleged, as the ground for termination, that the children had been found in a prior proceeding to have been neglected, abused or uncared for, and that the respondent had "failed to achieve [such] degree of personal rehabilitation [as] would encourage the belief that, within a reasonable time, considering the age[s] and needs of the [children], [she] could assume a responsible position in [their lives] . . . ." The petitioner further alleged that the department had made reasonable efforts to locate the respondent and to reunify her with the children but that reasonable efforts to reunify were not required because the court had previously approved a permanency plan other than reunification.

At trial on the petitions over several nonconsecutive days beginning on March 27, 2025, during which the respondent was represented by counsel, multiple witnesses testified and voluminous exhibits were admitted into evidence. On October 3, 2025, following the trial, the court, *Torres*, *J.*, issued a memorandum of decision terminating the respondent's parental rights as to Amyaliese and Avianzah. The court found by clear and convincing evidence that the children had previously been adjudicated neglected and that the respondent had failed to rehabilitate sufficiently to satisfy the requirements of § 17a-112 (j) (3) (B) (i). The court also found

The file in the present case contains a copy of the respondent's specific steps form with an attachment that lists specified treatment goals. The respondent, however, as discussed in part II of this opinion, claims that she did not receive any such attachment with her specific steps.

The specific steps form further ordered the respondent, inter alia, to "[t]ake care of the child(ren)'s physical, educational, medical, or emotional needs, including keeping the child(ren)'s appointments with his/her/their medical, psychological, psychiatric, or educational providers," to "[c]ooperate with the child(ren)'s therapy, including but not limited to Birth to Three," and to "[c]ooperate with the service providers recommended for parenting/individual/family counseling, in-home support services, substance abuse assessment/treatment, and/ or intimate partner violence/domestic violence services."

by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with the children, and that she was unable or unwilling to benefit from the reunification services.

In its memorandum of decision, the court made the following findings with respect to Amyaliese. "When Amyaliese . . . was an infant, she suffered an intracranial hemorrhage of unknown etiology. She had abnormal eye movement and vomiting when she was admitted to the hospital. While hospitalized, she suffered seizures. When she was released, she [was] required to follow up with neurology. She is diagnosed with cortical visual impairment due to a stroke of the occipital lobe. She has weak eye muscles and uses glasses to help keep her eyes focused. Amyaliese . . . meets the criteria for a . . . diagnosis of autism spectrum disorder with a severity rating of 2 [under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders].

"Amyaliese . . . works with a therapist at Family and Children's Aid and started with the agency on June 26, 2024. She is currently in third grade and has an individualized education plan . . . . By the time of trial, Amyaliese . . . had made great improvements in her interactions with peers at school and was more verbal. Her progress was noted to be remarkable. . . .

"Amyaliese . . . is diagnosed with autism, post-traumatic stress disorder and [attention deficit hyperactivity disorder]. Amyaliese . . . is working on expressing her emotions and working through her trauma. The modality of treatment is play therapy. They use art as a form of expression. It is [a] modality that is often used with children of Amyaliese's age. The goals of therapy were to assist her in expressing her emotion[s] and processing events that [she has] been through. This therapy permits children who may not have complete verbal capacity . . . to express their emotions and process events in nonverbal ways . . . [and] [i]n [Amyaliese's] case, to allow her to process her trauma and help her develop coping mechanisms to better address her emotions. . . .

"When Amyaliese . . . first worked with . . . [therapist Nancy] Solberg, she appeared insulated [and] would talk to herself quite a bit. Amyaliese . . . would use different voices, almost as if she were playing different characters. She would repeat phrases that were not relevant to the situation that was currently happening, often talking to herself using her own name and different voices. The clinician noted that Amyaliese . . . appeared to be demonstrating a history of trauma.

"On October 31, 2024 . . . Solberg wrote a letter to the department raising concerns about statements and actions by Amyaliese . . . during her sessions. . . . Solberg noted that, during therapy, Amyaliese . . . would act out scenarios where she was using a different voice and would use swear words. She would often use a deep male voice and say things such as, '[d]on't ever tell me what to do, I could break your hand,' and, shut the 'F up.' She would also use the mother toy to say, '[g]uess what, Avi, guess what, Amaya, I will never forgive you,' '[w]hat's wrong with you?' and, '[s]top it, Amaya.' . . .

"Solberg was able to observe [Amyaliese's] behavior while the parents were having visits and during a period of time when they ceased. She noted [that] during the period of ceased visits,[6] Amyaliese . . . would appear calmer for sessions, she would not run into other rooms, [and] she would be less aggressive in the therapeutic space. . . . Solberg saw an increase in engagement with Amyaliese . . . during that time. She would make eye contact and, at times, respond to direct questions. She

---

[6]We note that, after Amyaliese and Avianzah were committed to the care and custody of the petitioner, the respondent initially participated in weekly supervised visits with the children. In February 2024, the children's attorney filed a motion for modification of the visitation orders. In July 2024, the parties reached an agreement to temporarily pause visitation, and the department referred the respondent to Therapeutic Family Time for supervised visitation services. On November 14, 2024, the petitioner filed an emergency motion to cease visitation as to both children, and the court held a contested hearing on the issue of visitation on November 26, 2024, and on several dates thereafter. On March 21, 2025, the court ordered that supervised visits with Amyaliese be suspended but that supervised visits with Avianzah could continue.

saw a decrease in negative self-talk. . . . Her drawings evolved into pictures of fictional characters instead of real-life individuals. Her play between figurines became less aggressive. . . . This indicated to the clinician that Amyaliese . . . did not need the therapeutic space to process her trauma that had been her focus. . . .

"Once visits resumed, Solberg began to see the reverse happening. Amyaliese . . . began to escalate her negative behaviors. . . . The clinician made a direct correlation between the increase in negative reactions and the resumption of visits with [Amyaliese's] parents. She assessed that the visits between Amyaliese . . . and her biological family were retraumatizing her, leading to decreased emotional stability.

"[Amyaliese's] schoolteacher noticed a regression in [her] behavior once visits were reinstated. She noted in August of 2024 that Amyaliese . . . was happy, ready to learn and was able to make friends. During the month of August, visits were paused due [to] the escalating behavior of the children. Once visits were reinstituted, her teacher noted [that] Amyaliese . . . would bang her head, swear and at times scream profanities. She lost valuable education time during this period. Her behavior subsided in December of 2024. This calmer behavior coincided with the visits between the parents and children in November of 2024 being suspended.

"Similar behavior was observed by forensic psychologist [Jessica] Biren Caverly. During an [interaction] between Amyaliese . . . and [Antonio R.], she walked around with her fingers in her ears, scripting the entire time. During the interaction, [Antonio R.] was noted to have raised his voice and become loud. Amyaliese . . . was talking and talking the entire time. The psychologist noted that Amyaliese . . . was attempting to soothe herself, and it became more concerning that the source of trauma was from exposure to [Antonio R.]." (Footnote added.)

The court made the following relevant findings with respect to Avianzah. "[Avianzah] worked with Child First due to some aggressive behaviors displayed while in the foster home. While working with Child First, she would engage in several play scenarios. Avianzah . . . would act out herself or her sister getting in trouble with daddy. She had a doll she called her brother that she would hang . . . upside down. She would play with the toy ambulance frequently and would make a noise that may have been her brother's name. Avianzah . . . would bring up her brother almost every session, but, near the end of their work, the brother doll turned into the foster sister and the brother play diminished. Avianzah . . . would engage in doctor play and would scold the therapist, and say things like, 'no talking, sit down, be quiet.' During her sessions, she would put a Band-Aid on a bear, [which] would be representative of her brother. She would report that her brother had hurt his head. She worked with the service for seven months and was successfully discharged. She is currently placed with . . . Amyaliese . . . ."

The court also made the following findings regarding the respondent. "[The respondent] has a history with the department as a child due to sexual abuse, having been placed in the department's care two to three times. [The respondent] had a distressing time while in foster care. . . . [The respondent] was referred to [Midwestern Connecticut Council of Alcoholism, Inc.] for a substance abuse evaluation several times by the department. [The respondent] eventually attended an intake at Wellmore, and the agency did not recommend any treatment for substance abuse. They recommended [that the respondent] continue with her individual counseling at Stokes Counseling. She participated in visits via the [Quality Parenting] Center. [The respondent] completed the Circle of Security Program and the [Developing Options for Victim Education (DOVE)] program through Safe Haven. [The respondent] had intermittently attended therapy but was unsuccessfully discharged in November of 2024 due to too many no-call, no-shows to her appointments. The department offered parenting education through

[Parenting Support Services] and [Therapeutic Family Time]. [The respondent] was offered weekly visitation until November of 2024, when the court suspended visits between the children and both parents. Although provided with the contact information for the children's providers, [the respondent] failed to maintain communication with them to obtain updates regarding the children."

In light of the foregoing findings, the court concluded, in the adjudicatory phase of the termination of parental rights proceeding, that the petitioner had demonstrated by clear and convincing evidence that the respondent was unable or unwilling to benefit from the reunification efforts of the department. The court stated that, following the respondent's psychological evaluation, "it was clear that she needed to work with an individual therapist to process her historical trauma in order to be a resource for her children. However, she was unable to maintain the consistency in therapy necessary to achieve those goals. Further, she did not appear to have the capacity to understand the children's needs. Evidence of her visits demonstrated someone detached from her children and unable to work and interact with them in a meaningful way. She was inconsistent with services, with visits, and even had irregularities in her housing and employment. This does not begin to assess whether she has the ability to digest the information needed to successfully reunify, as she is disengaged from treatment." The court further found that a permanency plan other than reunification was approved by the court in June 2024 for termination of parental rights and adoption.

The court also found that the respondent had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in her children's lives. The court noted that the basis for the removal of Amyaliese and Avianzah "emanated from the injury and subsequent death of their younger sibling. An order of

temporary custody was taken and, at a later date, the children were adjudicated neglected by the court, where they were found to have been denied proper care and attention either morally, physically, or educationally. Neither parent admitted to causing harm to [Amateo], nor were the surviving children adjudicated by the court on any charges of abuse. What stands before the court is an allegation that [the respondent] failed to rehabilitate. Specific steps were issued. A subsequent court-ordered evaluation was conducted, and . . . recommendations [were made] to [the respondent] to achieve reunification. The issue of whether [the respondent] committed an act that led to [Amateo's] death *is not before the court*. The issue, consistent with the statute, is whether the parents are able to take a responsible position in the children's lives, considering their age[s] and needs." (Emphasis added.)

As to the respondent, the court stated that, "initially, [she] made strides toward completing her specific steps. Referrals were made for therapy in February of 2023. [The respondent] began services in April of 2023 with [therapist Tracy LaChapelle]. Her therapeutic goals were to process the loss of [Amateo] and work through the grief of having her other children removed. She was engaged from April of 2023 through November of 2023, and then [was] not engaged again until February of 2024 and [was] unsuccessfully discharged in November of 2024. [The respondent] claimed [that] there was an insurance issue; however, it was resolved in December of 2023. The social worker did send monthly texts to follow up on services and met with both parents after visits to remind them of the progress that needed to be made. Information was provided to the parents regarding the children's providers and educators. Neither parent engaged with them in any meaningful way.

"[The respondent] was referred to the Safe Haven DOVE program and successfully completed it. She was discharged from therapy in November of 2024 for several no-call, no-shows, despite expectation letters outlining

the need for individual counseling. She is not currently engaged in therapy. Neither parent developed a relationship with the children's providers or educators. This was an important step for them to better understand their children's needs and development. Family therapy could not begin until each parent made meaningful progress while in individual therapy to assure that each parent was stable.

"At the time of the filing of the petition[s], [the respondent] was engaged in therapy, but not consistently. Her housing was an issue. [The respondent] was behind in her rent and whether she could maintain her housing was uncertain. Stable housing would have been a necessary component to move toward rehabilitation. At the time, [the respondent] did not have consistent employment. The ability to financially meet [her needs] and her children's needs would have been critical prior to considering reunification. She had missed one [planning and placement team meeting] for Amyaliese . . . a meeting to understand and assist with her educational needs. She missed a second meeting, arriving five minutes before the meeting ended. Amyaliese . . . carries a diagnosis of autism. She requires a specialized educational plan to meet her needs. Understanding and being able to navigate [Amyaliese's] specialized needs would have been critical for reunification. When [the respondent] failed to regularly attend meetings, she was unable to demonstrate her ability to take on a parenting role for Amyaliese . . . .

"[The respondent] had not engaged with the children's therapists, something the department encouraged both parents to do. This was a critical piece to work through the negative behaviors they had exhibited during visits. This communication would have provided insight to the parents on the behavior of the children and their current state of mental health. [The respondent's] failure to engage and develop a relationship with the therapists did not create a belief that she was ready to take on a parenting role. During visits, [the respondent] had appeared fifteen to twenty minutes late for some visits and had

missed several other visits. In February of 2024, the psychologist raised concerns about the interaction between parents and children, noting the need for therapy. This was going to be a critical piece toward reunification. Unfortunately, [the respondent] was unable to achieve the movement necessary to meet the [children's] needs. Based on the concerns raised by the visiting supervisors, the visits with the children needed to be paused until a skilled supervisor could attend the visits to minimize the negative impact parental visits were having on the children. At the time of the filing of the [petitions], [the respondent] had failed to rehabilitate, considering the age[s] and needs of the children."

In the dispositional phase of the termination of parental rights proceeding, the court made findings as to each of the criteria set forth in § 17a-112 (k) and determined that terminating the respondent's parental rights was in the children's best interests.[7] Accordingly, the court rendered judgments terminating the respondent's parental rights and appointing the petitioner as the statutory parent for each child.[8] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the respondent's sole claim is that there was insufficient evidence to support the court's determination that she had failed to achieve the degree of personal rehabilitation required to avoid a termination of her parental rights. In making this claim, the respondent also challenges some of the court's subordinate factual findings as clearly erroneous. The petitioner contends, to the contrary, that the evidence presented at trial was sufficient to support the court's determination that the respondent failed to rehabilitate. The petitioner also argues that the court's subordinate factual findings were

[7] We note that the respondent does not challenge the court's finding that the termination of her parental rights was in the best interests of the children.

[8] The court also denied the respondent's motion for posttermination visitation with the children.

not clearly erroneous and, even assuming that some of the court's findings were clearly erroneous, any error was harmless. On the basis of our review of the evidentiary record and the court's findings, we conclude that the cumulative evidence was sufficient to justify the court's conclusion that the respondent had failed to rehabilitate.

We begin by setting forth the established principles of law and the applicable standard of review that govern the resolution of this claim. "Section 17a-112 (j) provides in relevant part: The Superior Court, upon notice and hearing as provided in [General Statutes §§] 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of [General Statutes §] 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to [§] 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the [petitioner] for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to [General Statutes §] 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional

phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j)(3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun. . . .

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j)(3)(B)] refers to the restoration of a parent to [her] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the [children] at issue. . . .

"[The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articu-

lated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation. . . . Whereas, during the adjudicatory phase of a termination proceeding, the court is generally limited to considering events that precede the date of the filing of the petition or the latest amendment to the petition, also known as the adjudicatory date, it may rely on events occurring after the [adjudicatory] date . . . when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time. . . .

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *In re Cameron H.*, 219 Conn. App. 149, 159–67, 294 A.3d 50, cert. denied, 347 Conn. 903, 296 A.3d 171 (2023).

Thus, "[i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it. . . . An important corollary to these principles is that the mere existence in the record of evidence that would support a *different* conclusion,

without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re Yolanda V.*, 195 Conn. App. 334, 345, 224 A.3d 182 (2020).

## II

After considering the record in a manner most favorable to sustaining the judgments, we conclude that the evidence reasonably supports the court's determination that the respondent failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i), considering the ages and needs of the children. First, although "[a] finding of rehabilitation is not based on a mechanistic tabulation of whether a parent has undertaken specific steps ordered"; (internal quotation marks omitted) *In re Anthony S.*, 218 Conn. App. 127, 149, 290 A.3d 901 (2023); the court appropriately relied on the respondent's lack of consistent engagement in individual counseling in finding that she failed to rehabilitate. In so concluding, the court recognized that, initially, the respondent "made strides toward completing her specific steps." Ultimately, however, the respondent did not maintain consistent engagement in individual therapy, which was one of her court-ordered specific steps. She was referred for individual therapy in February 2023 and began therapy with LaChapelle, a therapist, in April 2023, during which time the respondent was engaged until November 2023. The respondent was then not engaged in therapy until February 2024[9] and was unsuccessfully discharged from

[9] The record reveals that this gap in treatment from November 2023 until January 2024 was due in part to the therapist's taking a leave of absence. The record, however, also contains evidence that, during this time period, the respondent missed an appointment with another therapist in the same office as LaChapelle in December 2023 and a medication management appointment. The respondent also asserted that she had an insurance issue during this time period; however, the

therapy in November 2024. The court found, and the record reflects,[10] that the respondent was discharged from individual therapy for having several no-call, no-shows, and that, as of the time of trial, she was not engaged in therapy. The court found that family therapy could not be commenced until the respondent made meaningful progress in individual therapy. This finding is supported by the testimony of Monique McNally, a department social worker, who testified that, "in order to participate in family therapy, everyone needed to be engaged and making progress in their own individual therapies before the family therapy could start." Accordingly, the court's findings concerning the respondent's inconsistent engagement with individual therapy are supported by evidence in the record.

We disagree with the respondent that the department did not adequately inform her about the specific goals she was supposed to complete in therapy.[11] As noted previ-

court found that the insurance issue was resolved in December 2023. This finding is consistent with the testimony of Monique McNally, a department social worker.

Furthermore, the record contains a written record of phone correspondence from McNally to the respondent dated February 2, 2024, in which McNally gave her a list of services the department wanted her to engage in, noted the respondent's inconsistent engagement in therapy and missed appointments, and "strongly recommended" that she reengage in individual therapy. McNally sent a letter to the respondent in January 2025, stating that the respondent needed to reengage in mental health treatment to continue "working through [her] traumas and current situation." Nonetheless, it is not disputed that the respondent did not reengage in therapy after she was unsuccessfully discharged. The court reasonably could have relied on this evidence in concluding that the respondent was "engaged in therapy, but not consistently."

[10] A February 2025 department social study in support of the permanency plan of termination of parental rights and adoption, which was admitted as a full exhibit at trial, notes that the respondent was discharged by LaChapelle in November 2024 due to "too many no-call/no-shows." The study stated: "It was also reported that [the respondent] was not being honest about her situation with her therapist, [and] therefore . . . LaChapelle was not able to help her work through things going on."

[11] In making this argument, the respondent also claims, in conclusory fashion and without any meaningful analysis, that her specific steps were unconstitutionally vague as applied to her because they were not adequately explained or articulated by the department. We conclude that,

ously in this opinion, the court file in the present case contains a copy of the respondent's specific steps form with an additional attachment that lists specified treatment goals. The respondent claims that she did not receive this attachment with her specific steps. The respondent does not dispute, however, that she was ordered to participate in individual therapy, and the record reflects that she was unsuccessfully discharged by her therapist for lack of engagement. Moreover, even if we assume arguendo that the respondent did not receive the additional attachment that contained specific treatment goals, the respondent was canvassed by the court concerning her specific steps at the time they were ordered to be made final, which was the same day that she pleaded nolo contendere to the allegations of neglect in the underlying neglect petitions. At that time, the respondent did not express any confusion to the court concerning her individual therapeutic treatment goals.[12]

The court in the present case found that the respondent's therapeutic goals were to process the loss of her

to the extent the respondent intended to raise this issue as a separate claim, it was inadequately briefed, and, therefore, we decline to address it. See, e.g., *State* v. *Sidiropoulos*, 237 Conn. App. 262, 341 n.44, 351 A.3d 871 ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)), cert. denied, 354 Conn. 923, 353 A.3d 842 (2026).

[12]At the December 8, 2022 hearing, the following colloquy occurred between the respondent and the court:

"The Court: . . . I do need to go over the specific steps with the respondent . . . . I have before me a copy of the specific steps. Did you have a chance to review that with your attorney?

"[The Respondent]: Yes.

"The Court: Do you understand that these will be court-ordered specific steps?

"[The Respondent]: Yes.

"The Court: And that, in order to assist with your reunification, you need to comply with these court-ordered steps.

"[The Respondent]: Yes."

The respondent then asked the court why an intimate partner violence assessment was made a part of her specific steps. The court explained to

son and to work through the grief of having her children removed. This finding is consistent with McNally's testimony that her understanding of the respondent's therapeutic goals with LaChapelle, as of her initial engagement in April 2023, was that she would be working to "process the loss of her son and work through the grief surrounding that and having her other children removed." As noted previously, the record also reveals that the department sent the respondent expectation letters indicating that she needed to participate in individual therapy to work through her trauma and current situation. See footnote 9 of this opinion. A department social study in support of the permanency plan of termination of parental rights, which was admitted into evidence at trial, also stated that the respondent had been diagnosed with chronic post-traumatic stress disorder and that the respondent herself reported that she was "depressed due to the death of her child as well as having her surviving children placed into foster care."[13] McNally testified that LaChapelle had reported that, at the time the respondent was discharged, LaChapelle was "having trouble coming up with goals for [the respondent] and that [the respondent] was reporting that she was there because [the department] was telling her to be there. [LaChapelle] also reported she didn't think [the respondent] was being honest regarding . . . the current situation with [the children] and . . . [Antonio R.]." On the basis of our review of the record, we reject the respondent's argument that she was not adequately informed of her therapeutic treatment goals.

the respondent that the petitioner had requested an intimate partner violence assessment to determine "what, if any, level of care you need to address that in order to help with reunification." The respondent then indicated her understanding of that specific step.

[13]In addition to the respondent's reports of depression, the record also reflects that the respondent informed McNally in May 2023 that she had post-traumatic stress disorder due to the removal of her children from her care. The respondent also reported to McNally in March 2024 that she was taking Trazodone to help her sleep, as well as two anxiety medications.

We also disagree with the respondent's contention that the department did not establish that the respondent's failure to continue in therapy interfered with her ability to care for her children. The respondent was required to engage in individual therapy as part of her court-ordered specific steps to facilitate reunification, which she signed after being canvassed by the court. "Specific steps provide notice . . . to a parent as to what should be done to facilitate reunification and prevent termination of rights." (Internal quotation marks omitted.) *In re Marie J.*, 219 Conn. App. 792, 808, 296 A.3d 308 (2023). McNally testified that the respondent's therapeutic goals, as of the time of her initial engagement in therapy in April 2023, included processing the death of her son; however, due to the respondent's lack of engagement in therapy, she was unsuccessfully discharged. After the respondent was discharged, McNally provided written notice to her that she needed to reengage in therapy to continue working through her trauma and current situation. Moreover, Biren Caverly noted in her report that reengagement in therapy was critical to reunification, stating: "At this time, it is not recommended for Amyaliese or Avianzah to live with [the respondent]. [The respondent] must [reengage] in consistent mental health treatment, including therapy and medication management. It is particularly concerning that [the respondent] is likely not currently taking her prescribed medications."

The respondent's failure to reengage in therapy rendered it impossible to begin family therapy, which also was included in her specific steps. The respondent argues that "McNally admitted that the [respondent] was not presenting with any symptoms of [post-traumatic stress disorder] and that there was no indication that the [respondent's] purported failure to continue with therapy indefinitely had interfered in any way with her ability to care for herself or the children . . . ." This argument mischaracterizes McNally's testimony concerning her understanding of the respondent's post-traumatic stress disorder symptoms: McNally testified that the

respondent did not exhibit symptoms of post-traumatic stress disorder "when [she] saw her," not that she never had exhibited those symptoms at all. Further, McNally testified that the respondent's functioning would have been "up to the therapist to . . . inform [her] of." McNally testified that, although she had not seen "direct" evidence of an impact on the respondent's parenting, she also testified that, "if [the respondent] hasn't worked through what happened, and she's not using the medication to work through it, then it could impact her parenting if she's not sleeping, or if she's having, you know, nightmares." In addition to the testimony of McNally, who is a department social worker and not a psychologist, the record in the present case includes Biren Caverly's observation that, in order for reunification to take place, she believed that the respondent "must [reengage] in consistent mental health treatment . . . ." Biren Caverly referred in her report, dated January 22, 2024, to areas of concern vis-à-vis the respondent's mental health, including her history of anxiety, post-traumatic stress disorder, the fact that the respondent reported utilizing marijuana to sleep, and the fact that she had not been engaged in therapy for months prior to her evaluation.[14]

In addition, the court grounded its determination not only on the fact that the respondent had failed to

[14]Biren Caverly testified similarly at trial. The respondent's counsel cross-examined Biren Caverly at length as to how the respondent's mental health conditions affected her ability to parent her children. Biren Caverly testified in response that she had indicated in her report "various symptoms that [the respondent] was experiencing that could have been alleviated or worked on had she engaged in treatment." The respondent's counsel asked Biren Caverly: "[I]f a parent is able to function on a day-to-day basis without therapy or without medication, how can you say that their ability to parent is compromised or impacted?"

In response, Biren Caverly testified: "I think you're assuming I stated that [the respondent] was functioning on a day-to-day basis. There were many things that . . . [weren't] working. I had concerns about what her functioning really looked like, that I wanted her to be evaluated for. A provider had already come in and stated that she needed medication on a daily basis to function. So, I'm recommending that she be evaluated to take that medication so that she could function better. As well as engage in services, mental health services."

complete her individual therapy, but also on the basis of her inability to meet her children's specialized needs. This determination is amply supported by evidence in the record. See, e.g., *In re Judah B.*, 221 Conn. App. 387, 399, 300 A.3d 1253 (2023) (The "completion or noncompletion [of a respondent's specific steps] does not guarantee any outcome. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.)).

For example, the court found that "[i]nformation was provided to the [respondent] regarding the children's providers and educators. [The respondent did not engage] with them in any meaningful way."[15] The court noted that developing a relationship with the children's providers and educators was "an important step for [the respondent] to better understand [her] children's needs and development." The court further found that the respondent also missed a planning and placement team meeting for Amyaliese, and missed a second meeting, arriving five minutes before the meeting ended.[16] As

[15]The department provided information to the respondent regarding upcoming appointments for the children in May 2023. In August 2023, McNally sent the respondent an email that listed her children's providers and educators. Then, in February 2025, McNally emailed the respondent, stating: "You are expected to be checking in with the children's providers. You have been sent their list of providers multiple times and have not been checking in." A department social study in support of termination of parental rights indicated that the respondent had "sporadically" reached out to her children's providers.

[16]The respondent does not appear to dispute that she missed these planning and placement team meetings. She argues, however, that the court "suggest[ed]" in relying on these missed meetings that she therefore "neglected all of her school and other meetings regarding the children's services . . . ." We decline to read such a broad conclusion into the court's memorandum of decision. Moreover, although McNally acknowledged at trial that the respondent had attended "some" of Amyaliese's planning and placement team meetings, the fact that the respondent had attended some of the meetings did not preclude the court from relying on evidence of the missed meetings in concluding that she had failed to rehabilitate. This argument essentially asks this court to reweigh the

Amyaliese had a diagnosis of autism, the court found that she "require[d] a specialized educational plan to meet her needs. Understanding and being able to navigate [Amyaliese's] specialized needs would have been critical for reunification."

As to the children's providers, the court found that the respondent did not engage with the children's therapists, although the department encouraged her to do so. The court found that communicating with the children's therapists would have been a "critical piece to work through the negative behaviors [the children] had exhibit[ed] during visits," and would have provided the

evidence before the trial court and to draw a different conclusion from that evidence, which we decline to do. See, e.g., *In re Mariana A.*, 181 Conn. App. 415, 429, 186 A.3d 83 (2018).

We also disagree with the respondent's related argument that the court improperly shifted the burden of proof to her when it stated that, by failing to attend the planning and placement team meetings, "she was unable to demonstrate her ability to take on a parenting role for Amyaliese . . . ." First, to the extent that the respondent intended to raise a separate claim concerning the court's allocation of the burden of proof, we conclude that it is inadequately briefed, as only one paragraph of analysis is dedicated to this issue in her brief, which does not contain the appropriate standard of review or any meaningful analysis. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *In re Javonte B.*, 226 Conn. App. 651, 653 n.2, 318 A.3d 1095 (2024).

Second, even if we were to consider this claim, we would reject it. Construing the court's memorandum of decision as a whole, we are convinced that the court did not improperly shift the burden of proof to the respondent. The court stated that it found "by clear and convincing evidence that the *petitioner* has met her burden" of demonstrating that the respondent had failed to rehabilitate. (Emphasis added.) The court also stated that, in the initial adjudicatory phase of a termination of parental rights proceeding, "*the petitioner* must prove by clear and convincing evidence that there is a ground for termination as alleged in [the] petition, as of the date of filing the petition or the last amendment." (Emphasis added.) In context, we interpret the court's statement that the respondent did not "demonstrate" her ability to take on a parenting role for Amyaliese not as a statement that she did not meet her burden of proof but, rather, as a conclusion, on the basis of the evidence, that she had failed to rehabilitate.

respondent with insight into her children's behavior and current state of mental health. The court also noted that the respondent appeared late for some visits and missed other visits.[17] Regarding the supervised visits, the court noted that, on the basis of concerns expressed by the visiting supervisors, the visits had to be paused until a skilled supervisor could attend the visits to minimize the negative impact parental visits were having on the children. Furthermore, the court relied on Biren Caverly's concerns regarding the interactional evaluation that she had conducted. See footnote 17 of this opinion. The court also noted Biren Caverly's opinion that the family needed therapy and stated that therapy was a "critical piece toward reunification" in ultimately concluding that the respondent was "unable to achieve the movement necessary to meet the [children's needs]." Accordingly, the court concluded that the petitioner had proven, by clear and convincing evidence, that the respondent had failed to rehabilitate pursuant to § 17a-112 (j)(3)(B)(i).

The record contains ample evidence from which the court reasonably could have concluded that the respondent was unable to achieve the level of rehabilitation required to meet her children's specialized needs. See, e.g., *In re Cameron H.*, supra, 219 Conn. App. 169–70 (sufficient evidence supported conclusion that respondent failed to rehabilitate when children had special needs and, although respondent was provided with contact information for children's service providers to help her understand and accept their needs, respondent never contacted children's service providers); *In re Yolanda V.*, supra, 195 Conn. App. 351 (in evaluating respondent's

[17]Biren Caverly noted in her report that the respondent's foster mother had informed her that the respondent had missed one visit in November 2023 and another in December 2023. A department social study in support of termination of parental rights also noted that the respondent had missed visits in April and May 2024. Written summaries of the supervised visits between the respondent and the children, which were admitted into evidence, reveal that the respondent arrived late for several visits.

rehabilitation efforts, "the court understandably was mindful of [the] specialized needs of the minor children").

As noted previously, although the record reveals that the respondent participated in several supervised visits, the record also supports the court's finding that the respondent arrived late to several visits and missed others. See footnotes 16, 17 and 24 of this opinion. The record also supports the court's finding that, during visits, she appeared "detached from her children and unable to work and interact with them in a meaningful way."[18] See, e.g., *In re Yolanda V.*, supra, 195 Conn. App. 350–51 (despite completing visitation program, evidence substantiated court's finding that respondent missed three supervised visits with her children and had difficulty managing minor children during visits).

As to Amyaliese, McNally testified that she has autism and developmental delays, and that a neuropsychological evaluation indicated that she functioned at the level of a three and one-half year old. In addition, Amyaliese was diagnosed with attention deficit hyperactivity disorder

[18]In the department's August 2, 2024 social study in support of termination of parental rights, it was noted that the respondent had been consistent with her visits. During visits, however, it was "observed that more attention [was] paid to Avianzah than Amyaliese. Amyaliese is often seen on her tablet minimally interacting with her parents. . . . The [Quality Parenting Center] worker reported that [the] parents often brought fun things for the children to do but had a difficult time managing Avianzah's behavior and cleaning up . . . ." A summary from Therapeutic Family Time dated November 15, 2024, which was admitted into evidence, indicated that the respondent was "not appropriately responsive to the children when concerns occurred during visitation" and that it did "not appear that [the respondent] underst[ood] the complexities of [her] children's unique developmental and emotional needs."

Biren Caverly also noted after her interactional evaluation that, "[w]hile previous documentation had indicated that [the respondent] [was] bonded with the children, [she] did not appear bonded during the current evaluation. During the interactionals, there were concerns about the [respondent's] ability to manage the children. For instance, [the respondent did not intervene] when the children were screaming and stomping their feet. [She] struggled with following the children's cues. [The respondent] did not observe when Amyaliese hit herself in the head. The children did not appear to be comfortable turning to [the respondent] to meet their needs."

and post-traumatic stress disorder. Amyaliese also had a history of an intracranial hemorrhage of unknown etiology when she was two months old. In her report, Biren Caverly indicated that she had "significant concerns about Amyaliese's psychological functioning." She noted that Amyaliese was functioning at about the level of a prekindergarten pupil, although she was in the third grade, and stated that she "scripts" or repeats words that she has heard repeatedly throughout the day at school. Biren Caverly expressed concern about Amyaliese's scripting, stating that it "often seems to relate to abuse she witnessed and experienced." She opined that Amyaliese needed a consistent, structured placement to make progress and needed to "continue to engage in intensive in-home services . . . ." At trial, Biren Caverly testified that the respondent exhibited inconsistent engagement in the services that she was offered. Biren Caverly also testified that she had "significant concerns about [the respondent's] ability to manage the children" and that the respondent had a "pretty poor understanding of [Amyaliese's] needs. I think that she was not getting [Amyaliese] the services she needed early on."

As noted previously, on November 26, 2024, the court held a contested hearing on visitation, a transcript of which was admitted into evidence. See footnote 6 of this opinion. During that proceeding, Solberg testified that she had not met with the respondent, although she had been treating Amyaliese weekly since June 2024.[19] During her initial intake, Solberg testified, Amyaliese appeared "very insulated" and would talk to herself, using different voices, and "appeared to be repeating phrases that were not relevant to the situation in the room . . . ." Solberg interpreted Amyaliese's behavior as a means of self-protection and indicative of a history of trauma. She also testified that she observed aggressive play with a "toy

---

[19]Concerning the ability of the respondent to contact Solberg, Solberg testified: "I was made aware that [the respondent was] aware of me and had my contact information and that [she] could reach out and I could speak with [her]."

family having a father and sometimes mother, making angry, aggressive comments to the children, threatening them with physical harm and sometimes hitting the children." She also observed Amyaliese occasionally curse while using different voices and using critical language directed at herself. She noted that she had observed Amyaliese use the mother toy to say, "[g]uess what, Avi, guess what, Amaya, I will never forgive you," "[w]hat's wrong with you?" and, "[s]top it, Amaya." Solberg noted a decrease in these negative behaviors when visits with the respondent were suspended. Solberg testified, on the basis of her observations, that the visits with the respondent were retraumatizing Amyaliese,[20] leading to a decrease in emotional stability and functioning.[21]

At school, as stated previously in this opinion, Amyaliese has an individualized education plan and receives occupational therapy, speech therapy, and interventions with reading, writing, and math. Her fourth grade teacher, Danielle Piri Catanese, testified at trial. She testified that she had reached out to McNally in October 2024 due to increased negative behaviors exhibited by Amyaliese, which was the time period when supervised visits with the respondent had resumed. Specifically, Catanese testified that Amyaliese started to cry and would draw pictures, including one of a baby with wings. In November 2024, Catanese observed Amyaliese banging her head on a desk, cursing, and crawling under tables. These behaviors decreased in December 2024, and, as of

---

[20]Solberg's testimony was consistent with a letter she had written, dated October 31, 2024, that was admitted into evidence. The letter was also submitted into evidence during the contested hearing on visitation, at which time Solberg testified that the letter had been written to the department. In that letter, Solberg stated that, "[a]s a result of [her] observations, as well as the communication [she has] had with other providers, it is evident that these visits with her biological family are retraumatizing [Amyaliese], leading to a decrease in emotional stability and functioning, and making it more difficult for her to trust in and engage in [much needed] therapeutic services."

[21]During the termination of parental rights trial, Solberg testified that she continued to be Amyaliese's therapist and that she did not have any changes to make with respect to her prior testimony at the contested visitation hearing.

January 2025, her self-injurious behaviors had subsided. Catanese testified that, as of the time of trial, Amyaliese was performing better in the classroom but still needed assistance and continued services.

With respect to Avianzah, the evidence reflects that she had exhibited aggressive behaviors toward Amyaliese, for which she was referred to Child First for play therapy. Avianzah also has a history of needing speech therapy, which was expected at the time of trial to continue in the future, and she was also found to be delayed with respect to her social and emotional skills. Deborah Tault, a clinician with Child First, testified that she had treated Avianzah, who had been referred for "possible trauma," including the death of Amateo, and that it was "unknown . . . what she experienced in the home." During play therapy, Avianzah was observed acting out scenarios in which she imitated Antonio R. and getting into trouble "by daddy." Tault also observed Avianzah playing with a doll she called brother, which she would hang upside down. Avianzah was discharged by Tault in December 2023, upon improvement in her aggressive behaviors.

Avianzah attended the Danbury Readiness Center Program from May 2023 to June 2024, where she received speech services at school for a speech delay. In July 2024, Avianzah was enrolled in Growing Seeds Academy, and was noted to have shown hyperactive behaviors and to have struggled with impulse control and attention in day care, although those behaviors had improved. Avianzah also began individual therapy with Family and Children's Aid in October 2024 to address her issues with impulse control. During therapy, Avianzah was observed drawing people she identified as her biological parents and then taking her marker and "hitting the people on the paper very hard with it and [using] the word die while doing so." In a March 2025 addendum to the department's social study in support of termination of parental rights, Avianzah's teacher noted that she was making progress

in school but "does speak very loudly and can get aggressive with other children . . . ."

Biren Caverly's report highlighted both children's specialized needs and expressed her concerns with the respondent's ability to meet those needs.[22] Biren Caverly noted that Tault, at Child First, had indicated that Avianzah had trouble staying on task, which could stem from attention deficit hyperactivity disorder, trauma, or anxiety. Tault informed Biren Caverly that, if her foster mother is present, Avianzah can stay on task. Biren Caverly stated that the respondent had a limited

[22]In her reply brief, the respondent argues that the court "did not make any findings based upon [Biren Caverly's] testimony or report in support of its erroneous finding that the [respondent] failed to rehabilitate." It is true that the court did not make an explicit credibility determination concerning Biren Caverly in its memorandum of decision. The court, however, did note Biren Caverly's observations in its memorandum of decision. Furthermore, we disagree with the respondent's argument that, because the trial court did not make an express credibility determination concerning Biren Caverly, this court would be engaging in improper fact-finding by referring to her report. It is not the function of this court to find facts or to pass on the credibility of witnesses. See, e.g., *In re Nevaeh G.-M.*, 217 Conn. App. 854, 882, 290 A.3d 867 ("[b]ecause it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings" (internal quotation marks omitted)), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023). We may refer to Biren Caverly's report in our analysis, however, because it constitutes evidence in the record on which the *trial court* reasonably could have relied in concluding that the respondent had failed to rehabilitate.

The respondent also argues that the court should not have relied on Biren Caverly's observations because they were "outdated" and her opinions were "exposed during cross-examination as unreliable." The respondent argues that Biren Caverly's report contained an inaccurate recitation of the respondent's criminal history and that she had recommended that the respondent complete the Circle of Security parenting program, even though the respondent had already done so. We note that it is the trial court's exclusive function to credit all, some, or none of any witness' testimony and to afford it appropriate weight within its discretion. See, e.g., *In re Nevaeh G.-M.*, supra, 217 Conn. App. 882. As the respondent acknowledges, Biren Caverly was subjected to extensive, rigorous cross-examination concerning these issues. Moreover, on cross-examination, Biren Caverly testified that she would not change her opinions if she learned that the criminal history noted in her report concerning the respondent was not accurate. We conclude that

understanding of her children's needs. She also noted that she observed that the respondent struggled with the children, "failing to appreciate the children's atypical behaviors, including Avianzah's lack of language and Amyaliese's self-harming behaviors." Biren Caverly opined that Avianzah needed a consistent, structured home environment, and that she required continued speech therapy and ongoing assessment. Biren Caverly's report also noted that communicating with the children's providers and therapists was important to reunification; however, the respondent failed to do so. See, e.g., *In re Phoenix A.*, 202 Conn. App. 827, 844–45, 246 A.3d 1096 (respondent failed to rehabilitate when, although he underwent individual therapy, he ceased taking prescribed medications and continued to have problems with emotional regulation and demonstrated unpredictability during visits with minor child, which delayed reunification process), cert. denied, 336 Conn. 932, 248 A.3d 1 (2021).

We disagree with the respondent's contention that the court should have reunited her with her children once it was determined that she was not responsible for Amateo's death. Proceedings on a neglect petition and proceedings on a petition to terminate parental rights, however, are separate and distinct proceedings. See, e.g., *In re Ja'maire M.*, 201 Conn. App. 498, 506, 242 A.3d 747 (2020) ("[a] neglect petition and a petition for the termination of parental rights present distinct and separate claims" (internal quotation marks omitted)), cert. denied, 336 Conn. 911, 244 A.3d 563 (2021); see also *In re Cesar G.*, 56 Conn. App. 289, 294, 742 A.2d 428 (2000) (trial court, in determining whether cause for commitment no longer exists, may consider not only original cause for commitment but also may consider "if *any* cause for commitment still exists" (emphasis in original; internal quotation marks omitted)). Indeed, the trial court adjudicating the termination of parental rights is bound by the findings made in the prior neglect

the respondent's arguments are simply an invitation for this court to reweigh the evidence, which we decline to do.

proceeding, and, if no appeal is filed in a timely fashion, a respondent may not collaterally attack those findings.[23] See *In re Ja'maire M.*, supra, 506. Moreover, "[a]n adjudication of neglect relates to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. . . . [T]he adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [i]t is not directed against them as parents, but rather is a finding that the children are neglected . . . ." (Emphasis omitted; internal quotation marks omitted.) *In re Stephen M.*, 109 Conn. App. 644, 657–58 n.21, 953 A.2d 668 (2008); see also *In re Ja'maire M.*, supra, 508 ("[a] finding that a child is neglected is not a finding of fault against the parent but a fact relating to the status of the child"). We therefore reject the respondent's attempt in the present appeal from the judgments terminating her parental rights to essentially challenge the underlying neglect adjudication, which she had never challenged previously. See, e.g., *In re Ja'maire M.*, supra, 511–12 (rejecting respondent's attempt to collaterally attack adjudication of neglect after his parental rights were terminated and noting that respondent failed to fully meet criteria in his court-ordered specific steps, and never took any action previously to challenge adjudication of neglect and therefore acquiesced in that judgment).

As the trial court in the present case aptly stated, the "issue of whether [the respondent] committed an act that led to [Amateo's] death is *not before the court*. The issue, consistent with the statute, is whether the [respondent is] able to take a responsible position in the children's lives considering their age[s] and needs." (Emphasis added.) See, e.g., *In re Marie J.*, supra, 219 Conn. App.

[23]We agree with the petitioner that the respondent could have filed a motion to revoke the children's commitment pursuant to General Statutes § 46b-129 (m) had the respondent thought that the court was obligated to return the children to her care. Indeed, the respondent filed a motion to revoke commitment in September 2023 on the ground that she had been cleared as a suspect in Amateo's death, but she later withdrew that motion.

809 (concluding that respondent failed to rehabilitate when, although children were removed after he was incarcerated for alleged sexual misconduct involving minor child and his conviction was reversed on appeal, other issues remained unaddressed that affected his ability to parent minor child).

Furthermore, we do not agree with the respondent that her participation in required services demonstrated that she had rehabilitated. She also points to the lack of intimate partner violence in the home, lack of substance use, and the fact that she does not use physical discipline as sufficient evidence that she had rehabilitated. The respondent ignores our well established case law, however, that states that substantial, or even complete, compliance with court-ordered specific steps does not necessitate a conclusion that she rehabilitated. "A parent may complete all of the specific steps and still be found to have failed to rehabilitate." (Internal quotation marks omitted.) Id., 808; see also, e.g., *In re Omar I.*, 197 Conn. App. 499, 575, 231 A.3d 1196 ("[A] finding of rehabilitation is not based on a mechanistic tabulation of whether a parent has undertaken specific steps ordered. The ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time." (Internal quotation marks omitted.)), cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*, 592 U.S. 1150, 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020). Indeed, although the trial court acknowledged that the respondent had made "strides," this does not undermine the court's determination that she failed to rehabilitate. See, e.g., *In re Ryder M.*, 211 Conn. App. 793, 817, 274 A.3d 218 (evidence of respondent's progress, which court acknowledged, did not undermine determination that respondent failed to rehabilitate), cert. denied, 343 Conn. 931, 276 A.3d 433 (2022).

The respondent also argues that the court made its decision to terminate her parental rights on the ground

that she failed to rehabilitate on the basis of a number of clearly erroneous findings. We are not persuaded.

First, the respondent challenges the court's statement that she was "detached" from her children as clearly erroneous. Specifically, the respondent points to several exhibits in the record that summarize the supervised visits she had with her children to argue that she was attentive and engaged with them during visits. We recognize that visitation supervisors had characterized several visits as positive and noted that the respondent was engaged. The respondent, however, ignores that there was evidence in the record demonstrating that several of the supervised visits were not positive. For example, records from Therapeutic Family Time indicated that it had supervised a visit on October 9, 2024, during which Amyaliese was observed engaging in negative self-talk and profanity.[24] Then, on October 23, 2024, it was noted that there were "[m]any concerns . . . especially in regards to [the respondent's] ability to manage the children's behaviors and emotions." During this visit, Amyaliese again engaged in self-injurious behavior after which the respondent spoke to the child in a loud, stern tone. Amyaliese then began sobbing and stated that "they were going to kill her." (Internal quotation marks omitted.) The respondent's argument appears to be an attempt to ask this court to reweigh the evidence concerning her ability to meet her children's needs, which we decline to do. See, e.g., *In re Mariana A.*, 181 Conn. App. 415, 429, 186 A.3d 83 (2018) ("We cannot reweigh the evidence or reevaluate the credibility of witnesses to determine whether, in our own view, the evidence could have warranted granting the petition. Every reasonable presumption must be made in favor of the trial court's ruling denying the petition."). Because

---

[24]Similarly, in a department supervised visit on October 2, 2023, the respondent arrived late. During that visit, a department social worker observed Amyaliese state, "[y]ou're a bad girl. Bad, Amya, bad." (Internal quotation marks omitted.) The social worker also observed the children playing alone and heard Avianzah call out " 'mommy' " repeatedly while the respondent continued to look at her phone.

there is sufficient evidence in the record to support the court's determination, we cannot conclude that its finding that the respondent was detached from her children was clearly erroneous.[25]

The respondent next takes issue with the court's findings that, at the time of the filing of the termination of parental rights petitions, her housing was an issue, as she had been behind on her rent and had inconsistent employment. The respondent argues that McNally conceded that the respondent had stable housing at all relevant times. McNally testified that, as of the filing of the termination of parental rights petitions, the respondent's housing was an issue and that, "[f]or a while, she was behind on her rent, and she [did not have] a consistent job up to that point." McNally admitted, however, that, after the filing of the termination of parental rights petitions, the respondent's housing and employment situation had changed. She also testified on cross-examination that, at the time the present cases were commenced, the respondent had stable housing and that she continued to have stable housing thereafter. To the extent McNally may have testified inconsistently concerning the respondent's housing and/or employment status as of the time of the filing of the termination of parental rights petitions, "[i]t is well established that in cases tried before courts, trial judges are the sole arbiters of the credibility of witnesses and it is they who determine

[25]Because we reject the respondent's contention that the court's finding that she had appeared "detached from her children and unable to work [with] and interact with them in a meaningful way" was clearly erroneous, we also reject her related argument that the court's finding that she therefore lacked the cognitive ability to recognize and understand her children's needs also was clearly erroneous. We further note that the court did not ground its finding that she lacked the capacity to understand her children's needs solely on her detachment during visits. In making this determination, the court also considered her inconsistency with services, visits, and, at the time of the filing of the petitions, irregularities in her housing and employment, as well as her disengagement from her own mental health treatment. All of these facts reasonably could have been relied on by the court in concluding that the respondent did not have the requisite capacity to meet her children's needs.

the weight to be given specific testimony." *In re Antonio M.*, 56 Conn. App. 534, 540, 744 A.2d 915 (2000). We note that, generally, the court is limited to considering evidence that occurred before the filing of a petition to terminate parental rights; however, it may also, but is not required to, consider evidence occurring after the adjudicatory date in determining whether the respondent failed to rehabilitate. See Practice Book § 35a-7 (a); see also *In re Nevaeh G.-M.*, 217 Conn. App. 854, 880, 290 A.3d 867 ("[a]lthough a court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life in a reasonable time . . . *it is not required to do so*" (emphasis in original; internal quotation marks omitted)), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023).

In the present case, we agree with the petitioner that, even if the court's findings concerning the respondent's housing and employment status were clearly erroneous, they were harmless. The court also concluded that the respondent had failed to rehabilitate based on her lack of engagement in individual therapy and inability to meet her children's specialized needs, and, as we explained previously in this opinion, this conclusion was supported by sufficient evidence in the record.[26] Biren Caverly also testified that, even if the respondent had stable housing and income, this did not address the respondent's ongoing lack of engagement with her mental health

---

[26]The respondent also takes issue with the court's statement regarding her financial stability and argues that the court terminated her parental rights based on her economic status. Specifically, the court stated that the respondent's "ability to financially meet [her needs] and her children's needs . . . would have been critical prior to considering reunification." We do not agree with this characterization of the court's memorandum of decision. The court made this statement in finding that the respondent, at the time of the filing of the termination of parental rights petitions, did not have stable housing and employment. The court's memorandum of decision thoroughly outlined its reasoning, including the respondent's failure to fully engage in required individual therapy and lack of capacity to meet her children's specialized needs.

providers. Accordingly, even if the court's findings that the respondent lacked stable housing and employment were clearly erroneous, we are convinced, on the basis of the cumulative evidence in the record, that these findings were harmless.

Finally, the respondent challenges the court's finding that she did not develop a relationship with the children's providers or educators, which the court found was an "important step for [her] to better understand [her] children's needs and development." The respondent does not appear to challenge this finding as clearly erroneous but, rather, asserts that it does not support the court's conclusion that she had failed to rehabilitate. Specifically, the respondent argues that "this was not a step on [her] specific steps." (Emphasis omitted.) We first note, as stated previously in this opinion, that the court "need not base its determination [concerning a respondent's failure to rehabilitate] purely on the respondent's compliance with the specific steps." *In re Shane M.*, 148 Conn. App. 308, 329, 84 A.3d 1265 (2014), aff'd, 318 Conn. 569, 122 A.3d 1247 (2015); see also *In re Bianca K.*, 188 Conn. App. 259, 271, 203 A.3d 1280 (2019) (courts are "not strictly bound by the enumerated specific steps when determining whether a parent has failed to rehabilitate"). Although it is true that this precise language was not explicitly stated on the respondent's specific steps form, the form did require her to "[t]ake care of the child(ren's) physical, educational, medical, or emotional needs, including keeping the child(ren's) appointments with his/her/their medical, psychological, psychiatric, or educational providers," to "[c]ooperate with the child(ren's) therapy, including but not limited to Birth to Three," and to "[c]ooperate with the service providers recommended for parenting/individual/family counseling, in-home support services, substance abuse assessment/treatment, and/or intimate partner violence/domestic violence services . . . ." Moreover, the respondent concedes that the department encouraged

her to communicate with her children's providers.[27] Finally, we note that the court did not rely on its finding concerning the respondent's lack of a relationship with her children's providers and educators merely to conclude that she did not complete her specific steps. The court, instead, relied on this finding to conclude that she did not take an important step toward "better understand[ing][her] children's needs and development." This finding was appropriately made under its failure to rehabilitate analysis, pursuant to which the court must determine whether the respondent has achieved such "degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (i).

Construing the record in the manner most favorable to sustaining the judgments of the trial court, as we must; see, e.g., *In re Yolanda V.*, supra, 195 Conn. App. 352; we conclude that the record contains sufficient evidence to support the court's finding that the petitioner had proven by clear and convincing evidence that the respondent failed to rehabilitate such that, considering the ages and needs of the children, she could assume a responsible position in their lives within a reasonable

[27]We reject the respondent's argument that, even if her failure to communicate with the children's providers *was* a part of her specific steps, her failure to complete the specific steps, standing alone, was not a sufficient basis on which to justify terminating her parental rights. We agree, as stated previously in this opinion, that it is well established that the completion or noncompletion of specific steps does not guarantee any outcome. See, e.g., *In re Shane M.*, 318 Conn. 569, 587, 122 A.3d 1247 (2015). It is equally well established, however, that the specific steps are a "benchmark by which the court will measure the respondent's conduct to determine whether termination is appropriate pursuant to § 17a-112 (j) (3) (B)." (Internal quotation marks omitted.) *In re Shane M.*, supra, 148 Conn. App. 329. Accordingly, the court properly could rely on this evidence in concluding that the respondent had failed to rehabilitate.

time. Accordingly, the court properly concluded that the respondent had failed to rehabilitate.

The judgments are affirmed.

In this opinion the other judges concurred.